The fifth case for today was submitted on the brief so we'll turn to the sixth and final case for today. United States v. Segoviano. Good morning. May it please the court. My name is Jenny Anover and I represent the defendant appellant Jose Segoviano. This court should reverse the district court's motion to suppress his second consent to search and the statements that he made because the second consent to search was given during an unlawful detention and the statements were made during a mirandolous custodial interrogation. Ms. Anover, can you clarify the sequence of the search for the fugitive and then brought back into the apartment and interrogated after the apartment was cleared? At what point was he handcuffed and for how long after the apartment was cleared did he remain handcuffed? Yes, your honor. To answer your first question, Mr. Segoviano was detained in his home at the top of the staircase after agents had entered the apartment. He was then moved to the dining room table later and it was at that point when he was in his home that he gave the second consent to search. So when we say he was detained outside the apartment, it was on the stairway. Yes, your honor. It was on the top of the staircase inside his apartment. The staircase that the agents entered and walked up were part of Mr. Segoviano's apartment. He was detained initially at the top of the staircase. He was handcuffed at the top of that staircase. Agents moved to the apartment looking for Mr. Godinez. When Mr. Godinez was not found, the agents then moved Mr. Segoviano to his dining room table or kitchen table. He was seated there in handcuffs guarded by at least four armed agents while other agents roamed around the apartment and it was at that time when he was seated at his dining room table in his apartment that Mr. Segoviano gave the second consent to search. Was he ever taken outside? Your honor, the affidavit that is submitted by our client indicates that he was removed from the outside area of the inner part of the apartment, but he was still in the staircase when he was initially detained. But nevertheless, when the second consent to search was given, which is the operative time period here, he was clearly detained in his home and the government's basis for that detention was Terry. It's very clear from the record to determine when he was unhandcuffed. We know he was unhandcuffed at some point when he was seated at the dining room table, but can you clarify when he was uncuffed in connection with when he gave the consent? Was it before, after, or is that a disputed issue of fact? Your honor, I believe that at the time that he gave the second consent to search, he was still handcuffed and I believe that the record indicates that. But what's important here is that because the home has been recognized as a special and sacred place, the Terry exception has not been applied to the warrant requirement when there is an in-home search and seizure. And that argument stems from Payton v. New York and both the 11th circuit and the 9th circuit interpreting Payton and applying Payton have expressly stated that a Terry stop cannot be conducted on an individual in their home. And here, when Mr. Sarkubit, was it raised below? It seems to me that you're arguing the fact that the Terry stop can't take place in a person's home for the first time on appeal. Your honor, I would say that that's not an accurate reading of the record below. I would respectfully disagree. We raised the detention issue and while we did not specifically cite to Payton, we still challenged the legality of the detention. But I didn't see you arguing anything to the district court. I think there was a statement that you're challenging all phases of the detention, but I didn't see in the briefing below the argument that you're making now that the court questioning in the home was an improper Terry stop because Terry doesn't extend to the home. Is that fair? Your honor, I believe that we did challenge the detention issue and regardless if the position is that the argument has been waived, the government has waived waiver. They have not challenged the fact that we may have waived that argument, but I would stand by the position that we did not waive it. In a footnote in the reply brief, there is mentioned to the acknowledgement and recognition of how important the home is and how the 4th Amendment, if there's anywhere it must be applied, it has to be with respect to the home because it is this sacred and special place. In turning to the second piece of this argument, which is that if you determine, if this court determines that a Terry analysis must be applied here, the government did not have sufficient reasonable suspicion to believe that Mr. Segoviano was committing a crime at the time that he was detained and that is what's required under under United States versus Cortez, specifically that that there is reasonable suspicion to believe that the individual being detained has committed or is about to commit a crime. The only evidence that agents had when they finished the initial search of the house were some cell phone pings that are coming from an unidentified location near Mr. Segoviano's apartment building, a sighting of Mr. Godinez's girlfriend leaving the house two hours before agents enter, and the discovery of a Kia SUV, and this information taken together does not establish sufficient reasonable suspicion that Mr. Segoviano was committing the crime of aiding and abetting. More importantly, perhaps there's nothing in the record to indicate that at the time that Mr. Godinez was at Mr. Segoviano's apartment, Mr. Segoviano did not know that there was a warrant for Mr. Godinez's arrest or that he was wanted by the United States Marshals, and so there's nothing in the record to support this conclusion that Mr. Segoviano was committing or was about to The stated purpose for the detention, which was to, you know, observe if Mr. Godinez was there, that that had expired. I see that I'm getting I'm getting low on my time. I'd like to reserve the remaining time that I have for rebuttal. Okay, thank you. Ms. Yellen, over. Mr. Walker. Good morning, and may it please the court. Grayson Walker for the United States. The district court properly denied the defendant's motion to suppress, and the judgment should be affirmed. Regarding the defendant's first argument that he was detained without reasonable suspicion, the district court correctly rejected that argument. Forgive me, but the district court in its order states that while the agents conducted the that protective sweep while he sat handcuffed at the kitchen table, they questioned him about Godinez. Is that an accurate chronology? And then I have a follow-up question. Yes, it is. Judge Romer. Did the interrogation occur after the agents knew that Godinez was not present at the apartment? And if so, what specific facts at that time tied the defendant to Godinez? Judge. Yes, the Terry stop the questioning of the defendants about Mr. Godinez happened after the sweep of the defendant's apartment had determined that Mr. Godinez was not present. But there was reasonable suspicion to detain the defendant at that point, and I would direct. What was it? So, Judge, there are three key facts. First, agents had located the fugitive's vehicle, a vehicle that he used in connection with the shooting in the garage of the defendant's apartment building. Isn't it so that all they knew at the time that they a white Kia in the garage? Did they have a license plate? Judge, I think the record is clear that the license plate of that Kia SUV matched the vehicle that Godinez had used in connection with his shooting of an agent. So this is an instrumentality of a violent crime that is stored in the garage of the that Mr. Godinez was not found during that initial sweep. I think that actually increases the reasonable suspicion that attaches to the observation of that vehicle and instrumentality of crime because the fugitives absence suggest that the vehicle was stashed at this apartment for safekeeping. Agents had also observed a close associate of the fugitive leaving this apartment building. And we also know from the record that Judge Norco never relied on the Kia for the initial reasonable suspicion determination. That's not in his, you know, order. All that's there is a cell phone ping. Look, all the district court upheld reasonable suspicion based on a cell phone ping that pointed the agents to that building. I didn't see that the data led them to a specific apartment and Godinez's girlfriend's exit. If that were enough, and that's all the district court relied on, if that were enough to constitute reasonable suspicion, wouldn't that apply equally to every occupant of every apartment in that building? We know nothing about the layout or the occupancy of the apartment. Judge, we know at least this much about the layout of the apartment building. When agents entered, there was a door to the left and there was a door open leading up a staircase. That was the defendant's apartment. The door to the left was also another apartment. And it's in the record that after the discovery of this vehicle in the garage combined with the cell phone ping and the observation of the fugitive's girlfriend, the occupants of the downstairs apartment were also reasonably detained for questioning about whether they knew Mr. Godinez, the fugitive. So I would agree with you to the extent that this is a multi-unit building and the evidence that was present after the initial sweep created reasonable suspicion to question each occupant of the building, including Mr. Segoviano, the defendant here. Now, during that conversation, agents reasonably decided to question Mr. Segoviano back inside his apartment, which he had already allowed them to search for the presence of other people. Mr. Walker, at what point in there did Mr. Segoviano admit that he had been in the apartment, that the fugitive had been in his apartment? Judge, we know that it was at some point during approximately 30 minutes of questioning by the defendant's own... I'm sorry to interrupt. Was it after they took him to the dining room table, or did he admit that when he gave them consent to do the search or protective sweep of his apartment? The record is that he admitted his connection to Mr. Godinez only once he was seated back at his dining room table, so after the protective sweep of the apartment building. That conversation took approximately 30 minutes in the defendant's estimation, and that's because of the amount of information he provided about his contacts with Mr. Godinez on May 4th, the day of the shooting. He provided a lot of information that reasonably required follow-up questions and for the agents to have time to organize his statements into a timeline. After that exploration of the reasonable suspicion that was the basis for this temporary detention had been exhausted, agents reasonably asked Mr. Segoviano for consent to search his apartment for any evidence relating to Mr. Godinez's presence or his crimes. Before we get to the consent, you're talking about reasonable suspicion. Reasonable suspicion that the defendant did what? What's the government's view on that? Reasonable suspicion that he was harboring a fugitive? Reasonable suspicion that he was aiding and abetting the hiding? Reasonable suspicion of something else? What's the precisely the government's argument? Reasonable suspicion of aiding and abetting a fugitive based on the presence of a instrumentality of crime, that vehicle, an item with high evidentiary value in this fugitive investigation two days after the crime, a close associate of the fugitive seen at the same apartment building, and also we know that the fugitive's cell phone, if not the fugitive himself, was located near this apartment building on May 6th, 2018. So the theory is a fugitive. Where can I find evidence connecting the Kia to Godinez in the record? Where is it in the record? Judge, I'm looking at record 33-4. It's an ATF report, paragraph 10. I'm having a little trouble hearing. I don't know why from you. Maybe some connection, but go ahead. I beg your pardon. What does it say, Mr. Walker? It says located in the garage of the defendant's apartment building was a 2011 Kia Sorento registered to Destiny Rodriguez. This is a quote. This vehicle was identified as the vehicle that Godinez used to travel to 3106 North Cicero Avenue. Is Destiny his girlfriend? Yes, she was the one observed leaving the front door of the defendant's apartment building, Judge. What did they say in that encounter? What did she say? Judge, all we know from the record is that she was questioned on the street for a brief period of time after her trip to Walgreens Pharmacy. There's no substantive information about the statements Ms. Rodriguez made. And how could Judge Norgal have used the substantial, that she gave substantial evidence? Judge, I don't think that's a reference to any statements that Ms. Rodriguez made. The significance of that observation is that she's a close associate of the fugitive. Somebody whose body completely needs to know where the fugitive is. And she's seen at the same apartment building where the agents, again, found that instrumentality of crime in the garage. So, Judge, I see that my time has expired. I respectfully ask that the District Court's judgment be affirmed. Thank you, Mr. Walker. Before you end, Judge Robner or Judge Mahoney, did you have any further questions for Mr. Walker? Well, no. The only question I had was the encounter with the girlfriend hand with the police. And there was nothing that came out of that. Or Judge Robner, did you have any further questions? No. You see, Judge Norgal, yeah, I'm sorry. Yes. Judge Norgal's order never states what further evidence the girlfriend supplied. It just says and a girlfriend leaving a building. Well, it's worrisome. Judge, would you like me to respond? I guess. I'm sort of musing here. Yes, Judge. Again, there were no substantive statements obtained from Ms. Rodriguez that factor into the reasonable suspicion analysis here. And respectfully, it's more than just a cell phone ping and the observation of her. It's also that very high evidentiary value vehicle found in the garage. When did they know that the Kia... When did they know that the Kia was Godinez's? Before they questioned him? After they questioned him? Yes, Judge. The Kia here is referenced in the criminal complaint against Ernesto Godinez that was filed as a matter of public record before the events of May 6th. They knew as soon as they saw the vehicle. If there are no further questions from the panel, I ask that the district court be affirmed. Well, I'm done torturing you. Thank you, Mr. Walker. Ms. Yanova, we'll add a minute on since we had Mr. Walker with a few extra questions. So thank you. Thank you, Judge. I'd like to start with this reasonable suspicion discussion that we've just sort of been having, that the judges have sort of been having with opposing counsel. First, as Judge Rovner and Judge Mannion have just pointed out, there is absolutely nothing in the record with respect to what the girlfriend said about Mr. Godinez's whereabouts. If she had said that Mr. Godinez was in that apartment, surely that would have been included in the agent's reports and the agents would have probably entered the home much sooner than waiting two hours after questioning her and then entering the apartment. I also want to focus on the Kia. As Judge Rovner pointed out, this was an apartment with multiple units and the car was found in a common garage. So with respect to whether or not that is sufficient escalating reasonable suspicion, it just doesn't amount to it. Lopez, a case from this circuit, discusses reasonable suspicion and is directly on point here. The cell phone pings and the sighting of the girlfriend occurred before the initial search. Once that search was completed, the detention of Mr. Segoviano should have ended. There was not enough sufficient escalating reasonable suspicion in the discovery of a vehicle registered to the girlfriend of Mr. Godinez found in a common garage. Judge St. Eve, you asked about the aiding and abetting. Specifically, your question was what crime did agents suspect Mr. Segoviano of committing when Terry stopped him? The government answered by stating aiding and abetting. I want to make sure that it's clear that in order to establish the crime of aiding and abetting, an individual must know that the person they are aiding and abetting is in fact a fugitive or that there is a warrant out for their arrest. This is stated in United States v. Lockhart, another Seventh Circuit opinion. There is nothing in the record that suggests or indicates that agents were at Mr. Segoviano's apartment. They were there to determine where Mr. Godinez was. That's evident in all the questions that were asked, and that's evident in the reports that they wrote. With respect to when Mr. Segoviano learned of the fact that Mr. Godinez was wanted by United States Marshals, that information was not conveyed to Mr. Segoviano until hours after Godinez had left his apartment, and that's clear in the transcript of the summary recording that was made after agents had questioned our client for 30 minutes and had detained him. The second argument that we don't have too much time for, but it's this custody argument, I just want to make sure that I touch on that. It's our position that the district court erred in concluding that our client was not in custody. Clearly he was. This is closely in line with what we saw in Borutowski and in Lopez. He was guarded by seven armed agents in handcuffs, told he was detained. No reasonable person in his position would have felt free to leave, and he was interrogated. He was asked questions that would lead to incriminating statements, and for that reason, the statements that were made must be suppressed. For all the reasons discussed here today, that you cannot terry stop an individual in their house, there wasn't sufficient reasonable suspicion to conduct a terry stop, and because of the Miranda List custodial interrogation, the district court should be reversed. Thank you. Thank you, Ms. Yanover. The case will be taken under advisement, thanks to both counsel, and that concludes our session today. Thank you. Thank you. Thank you. Amy? Yes. I'd like to take